IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        v.                                   23-CR-99-LJV-JJM

JOHN THOMAS ERMIN,

                 Defendant.

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT ERMIN'S MOTION TO REOPEN THE DETENTION HEARING AND FOR RELEASE

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, and Caitlin M. Higgins, Assistant United States Attorneys, of counsel, hereby files its response to defendant Ermin's motion to reopen the detention hearing and for release (*see* Docket No. 213).

## PRELIMINARY STATEMENT

"God forgives.  Outlaws Don't."  *United States v. Ermin*, 710 F. Supp. 3d 163, 181 (W.D.N.Y. 2024), *aff'd*, No. 24-138, 2024 WL 1652240 (2d Cir. Feb. 21, 2024).  Along with "snitches are a dying breed," this is defendant Ermin's life credo, which aligns with the ethos of the criminal organization he once led—the Outlaws Motorcycle Club.  On December 19, 2023 and December 27, 2023, Chief Judge Elizabeth A. Wolford ("Chief Judge Wolford") held an extensive detention hearing as to this defendant.  *See* Exhibits B (December 19, 2023 Detention Hearing Transcript) and C (December 27, 2023 Detention Hearing Transcript).  Based on the totality of the evidence proffered, Chief Judge Wolford concluded that the defendant posed both a significant risk of danger to the community and risk of flight.

After this defendant learned that the Court released his co-defendant, Howard Hinkle, Jr., he saw an opportunity.  On September 12, 2024, the defendant moved to reopen his

detention hearing based on "changed circumstances." To be certain, the only change in circumstance in this case precipitating defendant Ermin's motion for release is defendant Hinkle's oral release order. The Court should adhere to Chief Judge Wolford's detention order and decline to reopen detention proceedings.

## FACTUAL BACKGROUND

On December 7, 2023, the government charged the defendant via criminal complaint with violating 18 U.S.C. § 922(g)(3) for possession of firearms while being an unlawful user of controlled substances. *See* 23-mj-167, Docket No. 1. Magistrate Judge H. Kenneth Schroeder held a detention hearing on December 12, 2023, after which he denied the government's motion for detention and released the defendant subject to conditions. *See id.* at Docket No. 2; *see* Exhibit A (December 12, 2023 Detention Hearing Transcript).

On December 12, 2023, the government filed a motion for a stay and for review of Judge Schroeder's release order. *See* 23-mr-552, Docket No. 1. District Court Judge John L. Sinatra granted the government's motion for a stay and scheduled oral argument for December 19, 2023. *See id.* at Docket Nos. 2 and 3. On December 15, 2023, the case was reassigned to Chief District Court Judge Elizabeth A. Wolford. *See* Docket No. 4. On December 19, 2023, Chief Judge Wolford held a detention hearing (*see* Exhibit B (December 19, 2023 Oral Argument Transcript) and continued the detention hearing on December 27, 2023, which spanned multiple hours (*see* Exhibit C (December 27, 2023 Oral Argument Transcript)). On January 3, 2024, Chief Judge Wolford issued a decision and order revoking Judge Schroeder's release order. *See id.* at Docket No. 10. On January 12, 2024, the defendant filed a notice of appeal of Chief Judge Wolford's decision and order. *See id.* at 11.

On January 5, 2024, the grand jury returned a 28-count indictment against nine defendants for conduct related to the death of Crystal Quinn. *See* Docket No. 24. With respect to the defendant, the grand jury charged him with the following five counts: 1) Count 1 – Title 18, United States Code, Section 1503 (Obstruction of Justice Conspiracy); (2) Count 2 – Title 18, United States Code, Section 1512(k) (Witness Tampering Conspiracy); (3) Count 3 – Title 18, United States Code, Section 1513(f) (Witness Retaliation Conspiracy); and (4) Count 24 – Title 18, United States Code, Sections 922(g)(3) and 924(a)(8) (Unlawful User of Controlled Substance in Possession of Firearms). *See id.* On January 10, 2024, this Court arraigned the defendant and ordered that he remain detained pending changed circumstances. *See* Docket Nos. 31 and 46. On April 16, 2024, the Second Circuit affirmed Chief Judge Wolford's detention order (which was rendered prior to the defendant's indictment). *See* 23-mr-552, Docket No. 18.

On July 22, 2024, the Court held oral argument with respect to the government's twelve-day delay in producing discovery to the defendants. *See* Docket No. 168. On July 29, 2024, Judge McCarthy issued a Decision and Order holding that the government acted in bad faith in producing the discovery to defendant twelve-days after the discovery deadline. *See* Docket No. 173. In the same Decision and Order, Judge McCarthy invited the defendants to propose sanctions for the discovery violation. *See id.* On August 7, 2024, the defendants filed submissions suggesting sanctions. *See, e.g.*, Docket No. 181. On August 12, 2024, the government filed a motion for reconsideration of Judge McCarthy's July 29, 2024 Decision and Order and response to the defendants' proposed sanctions. *See* Docket No. 191.

On August 23, 2024, Judge McCarthy held oral argument as to the government's motion for reconsideration of his July 29, 2024 Decision and Order (*see* Docket No. 191) and

on the defendants' proposed sanctions and issued a second Decision and Order denying the government's motion for reconsideration and imposing three sanctions. *See* Docket Nos. 199 and 200. On August 26, 2024, the government filed a notice of motion and motion for an extension of time to object Judge McCarthy's Decision and order and a motion for a stay of Judge McCarthy's decision and order. *See* Docket No. 201. The District Court granted the government's motion and ordered that the government file its appeal of Judge McCarthy's Decision and Order by September 20, 2024, staying Judge McCarthy's Decision and Order until the Court resolves the government's appeal. *See* Docket No. 202.

On September 9, 2024, this Court issued an oral release order as to defendant Hinkle. *See* Docket No. 209. On September 12, 2024, this defendant filed a motion to reopen his detention hearing. *See* Docket No. 213. For all the reasons stated below, the Court should deny the defendant's motion.

## ARGUMENT

### I.    THE COURT SHOULD DENY THE DEFENDANT'S MOTION BECAUSE HE FAILS TO MEET THE BURDEN TO REOPEN THE DETENTION HEARING.

Under the Bail Reform Act, a court, in its discretion, may reopen a detention hearing if information comes to light that is both new and material to the detention question. *See United States v. Zhang*, 55 F.4th 141, 148 (2d Cir. 2022) ("As an initial matter, we emphasize that the Bail Reform Act states only that a hearing 'may' be reopened if new and material information is presented. The Act therefore leaves the decision to reopen a hearing to the sound discretion of the district court." (internal citations omitted)). Specifically, a "hearing" "may be reopened" if:

> the judicial officer finds that information exists that *was not known* to the movant at the time of the hearing and that has a *material* bearing on the

issue of whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. § 3142(f)(2)(B) (emphases added).

In this vein, new information—or material information—alone is insufficient to reopen a detention hearing. *United States v. Maxwell*, 527 F.Supp.3d 659, 663 (S.D.N.Y. 2021). "A court's prior detention determination is a natural reference point against which to measure the materiality of new information for the purpose of reopening the hearing—that is, revisiting its earlier decision." *Zhang*, 55 F.4th at 147. "[I]f the new information would not change the court's previous decision, it is not material." *United States v. Hinkle*, No. 123CR00099LJVJJM, 2024 WL 1486072, at *1 (W.D.N.Y. Apr. 5, 2024).

Moreover, "[n]ew and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him," and must be rooted in "truly changed circumstances, something unexpected, or a significant event," *United States v. Quinones*, No. 13 CR 83S, 2016 WL 1694998, at *1 (W.D.N.Y. Apr. 28, 2016) (emphasis added) (quoting *United States v. Jerdine*, No. 08 CR 0481, 2009 WL 4906564, at *3 (N.D. Ohio Dec. 18, 2009)), that "increase the likelihood that the defendant will appear at trial" or "show that the defendant is less likely to pose a danger to the community." *United States v. Watson*, 475 F. App'x 598, 600 (6th Cir. 2012) (unpublished); *see also United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *1 (6th Cir. May 21, 2020) (unpublished) ("Courts . . . requir[e] a showing of truly changed circumstances or a significant event."). In other words, the "new evidence must relate in some *significant* or *essential* way to the decision whether to detain." *Worrell*, 2021 WL 2366934,

at *9 (D.D.C. June 9, 2021) (citing *United States v. Cisneros*, 328 F.3d 610, 614 (10th Cir. 2003)) (emphasis in original).

Here, the defendant asks this Court to reopen his detention hearing for two reasons: (1) because of pretrial delay and (2) based on his evaluation of the case against him. The Court must ask whether pretrial delay or defendant's evaluation of the case against him would have related in some significant or essential way to Chief Judge Wolford's detention decision. Because the answer is no, the Court should end the inquiry there and deny defendant's motion to reopen the detention hearing.

*First*, defendant contends that the Court should reopen the detention hearing and release him because of pretrial delay. *See* Docket No. 213-1 at 2 ("This Defendant has now lost 90 days or more as a result of the Government's actions and it constitutes a substantial change in circumstances. Mr. Ermin has been incarcerated over 9 months with an appeal of Magistrate McCarthy's Order pending, which will result in significantly more time before any trial of this matter."). The defendant fails to cite to a single legal authority for his position or explain how this decision would have impacted Chief Judge Wolford's detention hearing.

That failure comes as no surprise given the Second Circuit's rejection of that very argument in *United States v. Orena*, 986 F.2d 628 (2d Cir. 1993). In *Orena*, the Second Circuit was clear: "there is no statutory basis for the conclusion that the length of a pretrial detention warrants the granting of bail where there has been a finding of danger to the community." *Id.* at 630. "To the contrary, Congress rejected any specific time limit under the Bail Reform Act for detention pending trial, relying instead upon the Speedy Trial Act." *Id.*; *see United States v. Speed*, 09-CR-329A, 2013 WL 1221479 *7 (2d Cir. Mar. 25, 2013) (holding that "[c]ontinued detention remain[ed] appropriate" for defendants who had been in pretrial

custody for 44 and 48 months, and whose trials were "unlikely to occur" before later that year); *United States v. Newburn*, 15-CR-98-FPG-2, 2018 WL 1250018 *6, (W.D.N.Y. Mar. 12, 2018) (noting where the total pretrial detention period would exceed 37 months, "the Second Circuit and other courts in this district have held that much longer pretrial detention periods did not violate the Due Process Clause") (collecting cases); *United States v. Scott*, 12-CR-235, 2015 WL 13842749, *4 (W.D.N.Y. Sept. 15, 2015) ("Indeed, the Second Circuit has held, in certain circumstances, that periods of pre-trial detention of up to and including 40 months do not violate a defendant's due process rights.") (collecting cases); *United States v. Arrington*, 2022 WL 2586501, at *6 (W.D.N.Y. July 8, 2022) (denying defendant's motion for release based on pretrial delay); *United States v. Kidd*, Case # 15-CR-98-FPG-HKS-3, 2018 WL 2723991 *6, (W.D.N.Y. June 6, 2018) ("The Court recognizes that [possible excess of 38 months of pretrial detention] is an undoubtedly long period of time, but the Second Circuit and other courts in this district have held that much longer pretrial detention periods did not violate the Due Process Clause."). Because the argument fails as a matter of law, it follows that pretrial delay could not have impacted Chief Judge Wolford's detention decision.

*Second*, the defendant's evaluation of the strength of the evidence against him does not provide a basis to reopen the detention hearing. *See United States v. Esposito*, 354 F. Supp. 3d 354, 358–59 (S.D.N.Y. 2019) ("Other courts in the Second Circuit have found that "[n]ew and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." (quoting *United States v. Quinones*, No. 13 CR 83S, 2016 WL 1694998, at *1 (W.D.N.Y. Apr. 28, 2016)); *United States v. Acevedo-Baldera*, No. 3:18-CR-00155 (AWT), 2020 WL 9156933, at *5 (D. Conn. Nov.

23, 2020) ("[N]ew and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of . . . the strength of the case against him: truly changed circumstances, something unexpected, or a significant event.").

In his motion, defendant contends that his review of the discovery now allows him to rebut certain proffers by the government. *See* Docket No. 213-1 at 3-4. Not so. The defendant first posits that the government's proffer that defendant Gogolack lured Crystal Quinn to Wellsville, which, in his opinion, "[t]he Government based [] on a review of phone and text messages between Crystal Quinn and Simon Gogolack," was inaccurate and that the discovery makes "clear that the parties were in a romantic relationship and Crystal Quinn very much wanted to be with Simon Gogolack. Had Defendant had these communications, a strong argument would be made that Crystal Quinn was not "lured" to Wellsville." *Id.* at 3. The defendant is incorrect.

As demonstrated in Exhibit E, the text messages between Quinn and Gogolack indicate that that Gogolack invited Quinn to drive him to Wellsville so that he could get his taxes and replacement ID. When that did not work, defendant Gogolack threatened to shoot himself if he could not leave the city. And, when that did not work, defendant Gogolack told Crystal Quinn that his chemotherapy medication was in Wellsville. These texts, therefore, strongly indicate that Gogolack was trying to get Quinn to drive him to Wellsville, which is exactly what he did. When he arrived there, however, the evidence shows that he did not go to his home to get his taxes or take his chemotherapy medication. To the contrary, it shows that he brought her to a Rare Bread Motorcycle Club-affiliated poker game run by defendant Frank Knight and attended by defendant Howard Hinkle, who subsequently told Quinn that

there was a bounty on her life. That defendant feels he can make a "strong" argument to the contrary does not warrant reopening the detention hearing.

Similarly, defendant also asserts that the discovery undercuts the government's proffer regarding defendant Gogolack texting that "he was offering his services as a 'hit man' quoting the movie 'Irishman,'" and the government's "speculat[ion that [defendant] Gogolack offered 'to clean houses and park cars' somehow equated to looking for a job as a hitman." He fails to mention how (the simple answer is that the discovery does not). Rather, defendant Gogolack's text messages to co-defendant Bernard Byrd, III, (*see* Exhibit D), indicate that he was offering hitman services to his drug dealer at the same time that he was associating with Quinn. For example, on July 24, 2023, defendant Gogolack texted defendant Byrd, ████

████████████████████████████████████████████████████████

████████████████████████████████ *See id.* Long before defendant Ermin's detention hearing, members of law enforcement developed the opinion, based on training and experience, that these were slang references to providing hit-related-services , in the same vein that to "paint houses" alludes to "mob slang for carrying out a hit." *See* JACK GOLDSMITH, Jimmy Hoffa and 'The Irishman': A True Crime Story?, N.Y. REV. BOOKS, (dated Sept. 26, 2019) (noting that to "paint houses" "alludes to supposed mob slang for carrying out a hit"); *cf.* CHARLES BRANDT, I HEARD YOU PAINT HOUSES 11 (2004) (explaining that, in criminal enterprises, "painting houses" refers to "the blood that supposedly gets on the wall or the floor when you shoot somebody").

Of course, if there were any doubt as to this fact, defendant Gogolack eviscerates it when he texts defendant Byrd in more direct language stating, "████████████ ████

████████████" *See* Exhibit D. During the December 2023 detention hearings, the

government proffered, and Judge Wolford credited, that defendant Gogolack discussed starting a small business and that a reasonable person could infer that this reference was to starting a hitman service. Far from undercutting the government's proffer during the detention hearings, this proof is significantly more extensive than that proffered to Chief Judge Wolford and reinforces the government's argument. Again, the defendant's estimation of the evidence does not warrant reopening the detention hearing.

Finally, defendant states that "[s]ubsequent to [] Chief Judge []Wolford['ls Decision on January 3, 2024, [the government] significantly changed the timeline relevant to [d]efendant [] Ermin's visit to [d]efendant [] Gerace at Niagara County Jail." *See* Docket No. 213-1 at 3. He states that "[h]ad [d]efendant had this information during the hearing, we would have been able to respond that the claims of the [g]overnment [were] nothing more than speculation." Further, [d]efendant Ermin at the time was employed as [d]efendant Gerace's day manager. This visit was more consistent with work related discussions." *Id.* at 4. On January 6, 2024, the government sent a letter to Chief Judge Wolford, cc'ing defense counsel, clarifying the sequence of events. *See* 23-mr-552 Docket Nos. 13 and 14. Chief Judge Wolford did not alter her detention decision nor did the defendant move to reopen the detention hearing based on this letter, until now. What is more, on January 23, 2024, defense counsel certified a record of appeal and did not include the government's January 6, 2024 letter. *See* Docket No. 16. The defense, then, cannot credibly argue that this constitutes new information warranting reopening of the detention hearing.

Accordingly, because the defendant fails to present new information that would have been material to Chief Judge Wolford's detention decision, there is no basis to reopen the hearing. The Court should, therefore, deny the defendant's motion.

10

II.    **EVEN IF THE COURT REOPENS THE DETENTION HEARING, THE COURT SHOULD DENY THE DEFENDANT'S MOTION FOR RELEASE BECAUSE THERE ARE NO CONDITIONS OR COMBINATION OF CONDITIOSN THAT CAN ASSURE THE SAFETY OF THE COMMUNITY OR DEFENDANT'S APPEARANCE.**

Chief Judge Wolford held that no condition or combination of conditions could reasonably assure the safety of the community or defendant's appearance.  For all the reasons stated below, the Court should deny the defendant's motion because he fails to present a scintilla of evidence that merits disturbing that holding.

A. **The Court Should Deny the Defendant's Motion for Release Because All of the Section 3142(g) Factors Weigh in Favor of Continued Detention.**

Section 3142 of Title 18, enacted as part of the Bail Reform Act of 1984, *see* 18 U.S.C. §§ 3141-3156 ("Bail Reform Act"), requires that an accused be detained pending trial where, following a hearing in accordance with§ 3142(f), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(l).

Subsection (e) of § 3142 provides that there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure" against flight or danger where probable cause supports a finding that the person seeking bail committed certain types of offenses, including "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)," 18 U.S.C. § 3142(e)(3)(A), or "an offense under [18 U.S.C. §] 924(c)," *id.* § 3142(e)(3)(B).  Where there is such a presumption, the defendant "bears a limited burden of production not a burden of persuasion-to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433,436 (2d Cir. 2001).  Notably, even if a defendant carries this burden of production, the significance of

the presumption does not disappear. Rather, "it 'remains a factor to be considered among those weighed by the district court."' *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *Mercedes*, 254 F.3d at 436)).

The factors that the judicial officer must consider "in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," include "the nature and circumstances of the offense charged, including whether the offense is a crime of violence," or involves a firearm; "the weight of the evidence against the person"; "the history and characteristics of the person," including his "physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings"; and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Importantly, the same factors are to be considered in determining "whether the presumptions of dangerousness and flight are rebutted." *Mercedes,* 254 F.3d at 436.

Finally, "[t]he facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." *Id.* § 3142(f)(2); *see also United States v. Chimurenga,* 760 F.2d 400, 403 (2d Cir. 1985) (noting that the government "has the burden of establishing defendant's dangerousness by clear and convincing evidence"). That burden relaxes, however, where the government moves for detention based upon a risk of flight. Under those circumstances, the government need only

establish by a preponderance of the evidence that the defendant "if released, presents an actual risk of flight." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d. Cir. 2007) (citation omitted).

1. <u>The Court Should Deny the Defendant's Motion for Release Because the Defendant Fails Rebut the Presumption Pursuant to 18 USC § 3142(e) That No Condition or Combination of Conditions Can Reasonably Assure the Safety of the Community or Defendant's Appearance.</u>

Pursuant to 18 U.S.C. §§ 3142(e)(1) and (f), a rebuttable presumption applies that there is no condition or combination of conditions that will reasonably assure the safety of the community or appearance of the defendant. The Second Superseding Indictment charges the defendant with, *inter alia*, conspiring together and with others "to kill Crystal Quinn, a witness, with the intent to retaliate against Crystal Quinn for her attendance at an official proceeding, namely, a Federal grand jury proceeding in Case Number 23-CR-37," in violation of 18 U.S.C. 1513(a)(1)(A). *See* Docket No. 24 at 33. Title 18, United States Code, Section 1513 proscribes "the punishment for an offense under this section is (A) in the case of a killing, the punishment provided in sections 1111 and 1112," which delineates death or life imprisonment. *See* 18 U.S.C. §§ 1111 and 1112. The defendant wholly fails to address the rebuttable presumption or how any condition of release, let alone those he proposes, rebuts this presumptions.

Chief Judge Wolford's decision, which the Second Circuit affirmed, underscores that, even prior to this indictment, no condition or combination of conditions were sufficient to reasonably assure the safety of the community or defendant's appearance. *See Ermin*, 710 F. Supp. 3d at 182. This indictment only strengthens this contention.

What is more, surety and property bonds, do not address the danger this defendant poses to the community. Section 3142(c)(B)(xi), the condition addressing property bonds, explicitly pertains to risk of flight, stating that the defendant may "execute an agreement to

forfeit upon *failing to appear* as required, property of a sufficient unencumbered value, including money, as is reasonably necessary to *assure the appearance of the person* as required." (emphases added).

Where Congress leads, courts follow—and because the statute expressly contemplates using property bonds to secure a defendant's appearance, the Second Circuit pays such bonds little regard when evaluating a defendant's danger to the community. *See, e.g.*, *United States v. Moore*, No. 2:20-CR-187(1), 2021 WL 3425379, at *2 (S.D. Ohio Apr. 30, 2021), *report & recommendation adopted*, No. 2:20-CR-187(1), 2021 WL 2767094 (S.D. Ohio July 2, 2021) ("Defendant's proffer of real property titled in the name of a family trust and cash is, in the opinion of the undersigned, sufficient to assure the appearance of Defendant as required. The Court will therefore consider whether any condition or combination of conditions of release will reasonably assure "the safety of any other person and the community." (internal citations omitted)). Indeed, on at least three occasions, the Second Circuit has expressed doubt that bonds are capable to assure the safety of the community or any other person. *See Mercedes*, 254 F.3d at 436–37 (agreeing "with the government that [strong community ties, a substantial bond, or electronic monitoring cannot rebut the presumption of dangerousness] in this case"); *United States v. Ferranti*, 66 F.3d 540, 543 (2d Cir. 1995) (stating that the bond "would have deterred flight, not danger"); *United States v. Rodriguez*, 950 F.2d 85, 89 (2d Cir. 1991) ("The bail package offered by Rodriguez, *although it may reasonably assure the appearance of Rodriguez at trial*, will not reasonably assure the safety of the community." (emphasis added)).

2.  <u>The Nature and Circumstances of the Offenses Charged Weigh in Favor of Detention.</u>

The nature and circumstances of the offenses charged weigh in favor of detention. Although Chief Judge Wolford's detention decision was rendered prior to the indictment, she stated as follows:

> The posture of this case is unique, because the crime with which Defendant is charged—a single count of violating 18 U.S.C. § 922(g)(3) by possessing firearms while being a recreational user of marijuana—would likely not typically prompt the government to move for detention. *Rather, it is Defendant's role with the Outlaws MC and his possible involvement in the death of a federal witness that has driven the government's position concerning detention.* But as of now, Defendant has not been charged with any crimes directly linked to the Outlaws MC or the death of that witness. Nonetheless, in assessing Defendant's risk of danger and flight risk, the Court is not constrained to consider only the pending charge against Defendant. Here, considering the totality of the evidence proffered by the government over the two days of arguments, the Court easily concludes that Defendant presents both a risk of danger and flight risk, and no conditions could reasonably protect against those risks.

*Ermin*, 710 F. Supp. 3d at 178–79 (emphasis added). Thus, although Judge Wolford rendered her detention decision prior to the Second Superseding Indictment, her decision explicitly considered proof relating to the indictment's charges. Based on the charges in the complaint, Judge Wolford stated that she would "be hard-pressed to conclude that the Defendant should be detained." *Id.* at 179. The inquiry, however, did not end there and, in considering the proof of the charges in the indictment, Judge Wolford came to the "inescapable conclusion that Defendant must be detained." The Second Superseding Indictment, which serves as probable cause that the defendant committed the crimes charged, only strengthens this conclusion.

15

Likewise, the Second Superseding Indictment transforms the nature and circumstances from a section 922(g)(3) case to one involving a conspiracy to kill a federal witness. Indeed, on January 5, 2024, the grand jury charged the defendant with conspiring with others to kill Crystal Quinn in retaliation for her cooperation with the federal government. *See* Docket No. 24. If Chief Judge Wolford had occasion to consider the nature and circumstances of the offenses charged in the indictment, it is highly probable that she would have held that this factor weighed in favor of detention. *See, e.g.*, *United States v. Enix*, 209 F. Supp. 3d 557, 564 (W.D.N.Y. 2016) ("Defendant is charged with some very serious crimes, including a RICO conspiracy that involved a pattern of racketeering activity involving murder, robbery, kidnapping, drug trafficking, and obstruction of justice as part of its predicate acts. . . . While Mr. Enix may be charged in the least number of counts, and mentioned in the least number of overt acts, these are serious charges with significant potential penalties. Indeed, it is apparent that the magistrate judge based his detention determination on the nature and circumstances of the offenses charged, along with the rebuttable presumptions, and this Court agrees that consideration of this first factor under § 3142(g) weighs in favor of a finding that Defendant has not rebutted the presumptions of flight and danger, and he should be detained."). Accordingly, this factor weighs in favor of detention.

3.  The Weight of the Evidence Weighs in Favor of Detention.

The weight of the evidence similarly counsels in favor of the defendant's detention. Indeed, a panel of the Second Circuit has already concluded that "[t]he government proffered evidence that Ermin is the leader of a criminal enterprise regularly involved in acts of violence and attempts to obstruct justice." *United States v. Ermin*, No. 24-138, 2024 WL 1652240, at *1

16

(2d Cir. Feb. 21, 2024).  The government incorporates by reference its prior proffer[1] before Chief Judge Wolford, *see* Exhibits B and C, and its letter dated January 6, 2024, *see* 23-mr-552 Docket Nos. 13 and 14.  However, the government offers a condensed summary of that proffer and other evidence as follows.[2]

The instant indictment identifies Ermin as one of the individuals who conspired to murder federal witness Crystal Quinn.  Ms. Quinn was a witness against co-defendant Peter Gerace in Case No. 23-CR-37.  Though Gerace was initially indicted in Case No. 19-CR-227, it was the charges brought through 23-CR-37 that resulted in his detention.  During that proceeding, the government proffered information by which Gerace could have inferred that Ms. Quinn—his longtime confidant—was now cooperating with the government against him.  "Gerace was 'furious' about the fact that he had been detained, . . . and threatened that he had 'a long reach and people who could tie up his loose ends.'"  *Ermin*, 710 F. Supp. at 169.

Defendant Ermin is one of those people and, independent of Gerace, had a motive to silence Ms. Quinn, who shared damaging information about the Outlaws Motorcycle Club ("OMC") with the government, including that she consumed cocaine inside the Outlaws MC's clubhouse at 417 Northumberland Avenue, Buffalo, NY.  As a result of cooperation against the Outlaws, Ms. Quinn feared that members of the Outlaws MC would kill her, her mother, and her dog.  Ms. Quinn was especially scared because dead rats had been thrown on her mother's vehicle after she began cooperating with the government.

---

[1] The government prepared approximately 146 exhibits during the detention hearing before Judge Wolford.  Attached as Exhibit F is the exhibit list from the detention hearing.  The government can make any and all exhibits available for the Court's review.

[2] Mindful that it was the government's detailed detention proffer that alerted defendant Gerace to Ms. Quinn's cooperation, this proffer omits reference to witness testimony beyond that quoted in Chief Judge Wolford's decision and order and Ms. Quinn's statements to law enforcement.

The discovery shows that defendant Ermin and defendant Gerace met in-person in Gerace's detention facility on July 7, 2023. Unlike phone calls, such in-person meetings are not recorded by correctional facility staff and, in that regard, are consistent—when occurring between two criminals—with a desire to conceal the topics of discussion from law enforcement. Approximately three weeks later, Ms. Quinn—who was not an opioid user— was found with enough fentanyl in her system to kill 400 people.

In the intervening period, defendant Gogolack, who lived in Wellsville, NY, reappeared in Ms. Quinn's Buffalo-based life. Around that same time that defendant Gogolack was attempting to persuade Ms. Quinn to drive him to Wellsville, he offered co-defendant and fentanyl dealer Bernard Byrd hitman-related services, as shown in Exhibit D.

Gogolack ultimately convinced Ms. Quinn to take him to Wellsville. He promptly took her to a poker game ran by Frank Knight, a close associate of the Rare Breed Motorcycle Club (the "RBMC"). The RBMC is a support club of the Outlaws, the same club defendant Ermin headed, and has held events at Pharoah's. Support clubs often do the dominant club's bidding, thereby separating and insulating the dominant club from the illegal activity it has directed.

Text messages indicate that in the early hours of the next morning—shortly after Ms. Quinn and Gogolack spent time with defendant Hinkle, another RBMC associate—an armed confrontation occurred between Ms. Quinn, co-defendant Gogolack, and co-conspirators unknown to the Grand Jury. Based on the text messages, it appears that Gogolack and Ms. Quinn were separated. At approximately that same time, Ms. Quinn texted another individual expressing her belief—and concern—that Gogolack and "bikers" were setting her up to be killed.

18

As Chief Judge Wolford acknowledged, Gogolack lacked "any apparent motive to harm [Ms.] Quinn." *Ermin*, 710 F. Supp. at 180. The same cannot be said for this defendant, who had both an incentive to kill Ms. Quinn and the reach to see that she died. In this vein, it is significant that on October 24, 2023, defendant Ermin received a phone call from co-defendant Michael Roncone shortly around the same time that Roncone spoke to co-defendant Knight. Knight, in turn, had just recently exited an interview with the FBI related to Ms. Quinn's death.

Plainly, the Second Circuit's observations are as true today as they were when it denied defendant Ermin's detention appeal: there is no error in concluding that "Ermin poses a serious risk to the community and that no conditions could reasonably protect against that risk." *Ermin*, 2024 WL 1652240, at *1.

### 4. The Defendant's History and Characteristics Weigh in Favor of Detention.

Chief Judge Wolford thoroughly assessed the defendant's history and characteristics and held that this factor weighed in favor of detention. *See Ermin*, 710 F. Supp. 3d 179-182. This included, *inter alia*, holding that the government established "clearly and convincingly" that the defendant is the president of the Outlaws MC and that there was "not only a close relationship between [defendant Ermin] and [defendant] Gerace," but also a "symbiotic connection between the Outlaws MC and Pharaoh's" and, as such, the defendant was "responsible for the illegal vents occurring at the Outlaws MC Clubhouse, including the use of dangers from Pharaoh's and treatment of women. *See id.* at 180. Moreover, Judge Wolford rejected the argument that release was warranted because "the [d]efendant has no prior criminal record," and his ties to the community (*see* Docket No. 213-1 at 5). *See id.* at 174. This is all to say that nothing has changed for this Court to disturb Chief Judge Wolford's or

the Second Circuit's holding as to the defendant's history and characteristics weighing in favor of detention.

     5.  <u>The Nature and Seriousness of the Danger to any Person or the Community That Would be Posed by the Person's Release Weighs in Favor of Detention.</u>

Similarly, Chief Judge Wolford thoroughly assessed the nature and seriousness of the danger this defendant poses to the community if released. *See id.* at 180-81. Indeed, Chief Judge Wolford held, *inter alia*, that the government proved by clear and convincing evidence that the defendant presented a risk of obstruction of justice if released, "for which *no conditions can reasonably protect*." *Id.* at 180 (emphasis added). Chief Judge Wolford also held that "there are acts of violence that lead to the conclusion by clear and convincing evidence that if released, Defendant would present a risk of danger that could not be reasonably protected through the imposition of conditions." *Id.* 181. Specifically, Chief Judge Wolford held as follows:

> Based on the government's proffer, including witness interviews, the tattoos on Defendant's body, the patches on his Outlaws MC vests, Defendant's documented prior encounters with law enforcement, and his leadership role within an organization that the evidence shows (including video evidence) engages in acts of and threats of violence, the Court concludes that Defendant has previously engaged in acts of violence on behalf of the Outlaws MC, and he has directed others to engage in this conduct. It seems apparent that Barnes is one of Defendant's primary enforcers, as evidenced by—among other things—Barnes' living arrangements and his close physical presence near Defendant at both the Outlaws MC leadership meeting in February 2023, and the party at Gerace's house during Labor Day weekend of 2022. Barnes played a key role, as reflected by the video evidence, in the encounter with the KMC member at Halligan's Bar in November 2022. Benson, an individual who had been involved in a physical altercation with Defendant some 12 years earlier, was also part of the show of force at Halligan's Bar. In other words, the evidence demonstrates that in his role as president of the Outlaws MC, Defendant controls legions of members who are willing to engage in threats of violence over issues as

> insignificant as whether a member of a rival motorcycle gang is
> wearing clothing viewed as disrespectful by the Outlaws MC.

*Id.* If anything the nature and seriousness of the danger this defendant poses is amplified by the fact that co-defendant Gerace begins trial in approximately one month. At bottom, Chief Judge Wolford held that the nature and seriousness of the danger this defendant posed to the community was such that no condition or combination of conditions could ameliorate. The defendant fails to present any evidence that remotely, let alone significantly, bears on Chief Judge Wolford's holding.

> **B. The Court Deny the Defendant's Motion Because No Condition or Combination of Conditions Can Reasonably Assure the Safety of the Community or Defendant's Appearance.**

Chief Judge Wolford held that this defendant posed both a danger to the community and risk of flight. Defendant's risk of danger to the community is discussed at length above and in Judge Wolford's opinion. As to risk of flight, Chief Judge Wolford held that:

> But Defendant and his wife both seemingly lied to the USPO when asked about his history of international travel. Defendant's apparent efforts to conceal his international travel are deeply troubling to the Court, and underscore the Court's conclusion that he is a serious flight risk. The most logical explanation for being untruthful about Defendant's international travel is that Defendant (and his wife) were attempting to hide his international connections. And the reality is that the Court has no way of ascertaining the extent of Defendant's financial resources. Defendant's representation that he has no bank accounts demonstrates his ability to operate in a manner that cannot easily be traced or detected. With a network as wide and vast as the Outlaws MC that includes convicted felons and a deep reach within the Bureau of Prisons and around the world—reflected by the financial donations received by Defendant while hospitalized in 2020 with COVID—it is apparent that Defendant would have resources available to assist with any flight that could not be adequately addressed through reasonable conditions.

*Id.* at 182. Chief Judge Wolford held that "the Court is charged with assessing whether Defendant's release would present a risk of danger and/or flight and, if so, whether conditions

could be put in place that would reasonably protect against those risks. Given the totality of the evidence proffered by the government, the Court concludes that the answer to that question requires Defendant's detention." *Id.* The *only* significant change in circumstance, as contemplated by the case law, is that the defendant's risk of danger and flight has only increased due to the charges in the Second Superseding Indictment. If Chief Judge Wolford held, prior to the indictment, that no condition or combination of conditions could address either the risk of danger or flight, the conditions suggested by the defendant now are patently insufficient.

 1. Monetary and Property Bonds Do Not Mitigate the Danger that Chief Judge Wolford Held the Defendant Poses.

For the first time, defendant proposes that he would be willing to post a property and monetary bond to secure his release. *See* Docket Nos. 213-1 and 219. The defendant never offered to do so in argument before Judge Wolford and has cited no change in circumstances that prevented him from doing so. Although Chief Judge Wolford did not explicitly address bonds as a condition of release, she held that *no condition or combination of conditions* would protect against either the risk of danger posed to the community or flight. *See Ermin*, 710 F. Supp. 3d at 182. Thus, Chief Judge Wolford, who could have imposed, *sua sponte*, property or monetary bonds, did not because she did not believe that such conditions would sufficiently guard against either risk of flight or danger to the community. There is simply no reason to disturb that holding now, when, as discussed above, the risk defendant poses as to both is far more grave now. This is all the more true considering that the Second Circuit has repeatedly found that property bonds do not mitigate against a defendant's danger to the community. *See United States v. Mercedes*, 254 F.3d 433, 436–37 (2d Cir. 2001) (agreeing "with the government that [strong community ties, a substantial bond, or electronic monitoring cannot

rebut the presumption of dangerousness] in this case"); *United States v. Ferranti*, 66 F.3d 540, 543 (2d Cir. 1995) (stating that the bond "would have deterred flight, not danger"); *United States v. Rodriguez*, 950 F.2d 85, 89 (2d Cir. 1991) ("The bail package offered by Rodriguez, *although it may reasonably assure the appearance of Rodriguez at trial*, will not reasonably assure the safety of the community." (emphasis added)).   Accordingly, the Court should deny the defendant's motion for release based on the property bond and any monetary bond because no condition or combination of conditions can reasonably assure the safety of the community or defendant's appearance.

> 2. Home Incarceration with Electronic Monitoring is Insufficient to Assuage Either the Danger or Risk of Flight that Chief Judge Wolford Held the Defendant Poses.

For similar reasons, the Court should deny the defendant's motion because home incarceration with electronic monitoring is insufficient to address risk of flight or danger to the community in this case.   Chief Judge Wolford revoked Judge Schroeder's release order, and the Second Circuit affirmed, imposing these exact conditions.   The defendant fails to demonstrate how such a condition is sufficient now.

## CONCLUSION

For all the reasons stated above, the Court should deny the defendant's motion in total.

DATED:  Buffalo, New York, September 18, 2024.


TRINI E. ROSS
United States Attorney

BY:    s/ CAITLIN M. HIGGINS
       Assistant United States Attorneys
       United States Attorney's Office
       Western District of New York

138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5818
Caitlin.Higgins@usdoj.gov