IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                                  23-CR-99-LJV

SIMON GOGOLACK, et al,

Defendants.

---

## DEFENDANTS' JOINT RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION TO RECONSIDER ASSIGNMENT OF SECOND CJA COUNSEL

Defendants Peter Gerace, Jr., and Johnathan Ermin, by and through counsel, provide the following memorandum in response to the government's motion for reconsideration of assignment of second CJA counsel for defendants, filed on February 20, 2025 [355][1].

The Table of Contents is as follows:

I.    Introduction ........................................................................................... 3

II.   Background ............................................................................................ 4

      A.    Capital Eligible Charges.............................................................. 4

      B.    Requests for Learned Counsel & Capital Resources................................. 6

---

[1] Bracketed references are to the CM/ECF docket entries, and page references are to CM/ECF pagination.

C.       Requests for Second Counsel ........................................................................ 9

D.       Complexity of this Case ............................................................................. 10

E.       The February 5, 2025, DOJ Memorandum Directing Review of Decision
Not to Seek the Death Penalty.................................................................................... 14

III.     Applicable Law .................................................................................................. 15

A.       Government Lack of Standing ................................................................... 16

B.       The Court's Discretion ............................................................................... 17

C.       Motions for Reconsideration .................................................................... 19

D.       The Law of the Case Doctrine ................................................................. 22

IV.      Discussion .......................................................................................................... 23

A.       The Government Should Not be Permitted to Weigh in on Appointment
of Counsel .................................................................................................................... 23

B.       The Government Does Not Establish a Basis for Reconsideration ......... 24

C.       The   Government's   Reconsideration   Motion   Consumes   Defense
Resources and Risks Causing Additional Unnecessary Delay............................ 26

D.       The Government Claims Concern for Taxpayer Expense Without Any
Oversight or Limit on its Own Expenditure of Funds ......................................... 28

E.       The Court Should Still Appoint Learned Counsel & Capital Resources 30

F.       This Case Supports the Determination that Two Attorneys Should be
Retained Even if the Government Indicates That It Still Does Not Intend to Seek
the Death Penalty ........................................................................................................ 33

V.    Conclusion ............................................................................................. 46

# I.  INTRODUCTION

On February 20, 2025, the government filed a motion that continues the government's practice of filing submissions when it loses a motion, and then within that submission, requesting reconsideration despite the drain on court resources, the burden it puts on the defendants and the delay that it creates.

In this particular instance, at the status conference on February 10, 2025, this Court determined that second counsel would be appropriately assigned to Peter Gerace, Jr., and John Thomas Ermin.[2]

The Court did not make that decision in a vacuum. The decision is informed by the Court's own observations regarding the government resources poured into this case, including an appearance on the docket by <u>nine</u> government attorneys. The Court is also informed by an abundance of information establishing the complexity of this case, most of it articulated by the government.[3] The Court is also aware of the February 5, 2025, Department of Justice (DOJ) memorandum and its implication that this administration believes that a no seek determination can be subject to reconsideration at any time.

---

[2] The Court reserved on the separate motion that Learned Counsel and capital resources be assigned until the government can provide an update on the review process of the prior no seek determination.

[3] In the motion before the Court, the government now argues that this case is not complex. *See e.g.* [355] at 28. This directly contradicts the government's previous statements reviewed in the Background section, *infra*.

The Court, mindful of these considerations and others, appropriately appointed second counsel to Mr. Gerace and Mr. Ermin, and for reasons discussed below, the government's motion for reconsideration should be denied.

## II.    BACKGROUND

### A.    Capital Eligible Charges

Defendant Simon Gogolack was charged by Complaint on August 17, 2023, and initially appeared on August 23, 2023. Magistrate Judge Case Number ("Magistrate no.") 23-mj-01115-JJM, [1, 4]. Mr. Gogolack was indicted less than one month later on September 13, 2023 [12].

Other defendants were charged individually by separate complaints, including: Howard Hinkle (Magistrate no. 23-mj-05219-MJR)[4]; Michael Roncone (Magistrate no. 23-mj-00168-HKS); Scott Barnes (Magistrate no. 23-mj-00166-HKS); and John Ermin (Magistrate no. 23-mj-00167-HKS).

On January 5, 2024, a Second Superseding Indictment was filed against Mr. Gogolack, which included Mr. Gerace and all of the defendants listed above [24]. Among the counts charged were: Count 2: Witness Tampering Conspiracy pursuant to 18 U.S.C. § 1512(k) and Count 3: Witness Retaliation Conspiracy pursuant to 18 U.S.C. § 1513(f).

---

[4] Howard Hinkle was also charged with Dillon Anderson who has since had his charges dismissed. *See* Magistrate no. 23-mj-05219-MJR, [20].

These counts charged the same four defendants, including: (1) Mr. Gerace; (2) co-defendant Ermin; (3) co-defendant Hinkle; and (4) co-defendant Gogolack.

Counts Two and Three focus on allegations of conspiracies related to Crystal Quinn, an individual who the Government had intended to call as a witness against Mr. Gerace in the trial scheduled for case numbers 19-cr-227 and 23-cr-37. Crystal Quinn died in August 2023 from a reported drug overdose. The alleged conspiracies under these two counts constitute death eligible offenses because the object of the alleged conspiracy was to kill Crystal Quinn.

In Count Two, the indictment alleges that the defendants "did knowingly and willfully combine, conspire, and agree together and with others, known and unknown to the Grand Jury, to commit" offenses, including specifically "to kill Crystal Quinn, a witness, with the intent to prevent the attendance and testimony of Crystal Quinn in Case Nos. 19-CR-227 and 23-CR-37… and with the intent to prevent communication by Crystal Quinn to a law enforcement officer of the United States relating to the commission and possible commission of a Federal offense, in violation of Title 18, United States Code, Sections 1512(a)(1) and 1512(j)" [24] at 31-32.

In Count Three, the indictment alleges that the defendants "did knowingly and willfully combine, conspire, and agree together and with others, known and unknown to the Grand Jury, to commit" offenses, including specifically "to kill Crystal Quinn, a witness, with the intent to retaliate against Crystal Quinn for her attendance at an official

proceeding, namely, a Federal grand jury proceeding in Case Number 23-CR-37 in the United States District Court for the Western District of New York, in violation of Title 18, United States Code, Section 1513(a)(1)(A)" [24] at 33.

## B. Requests for Learned Counsel & Capital Resources

As result of the aforementioned charges, and since the indictment presents allegations that could support various charges eligible for the death penalty, the defendants were entitled to the appointment of qualified Learned Counsel pursuant to 18 U.S.C. §3005, 18 U.S.C. §3006A(e) and the Judicial Conferences' Guide to Judicial Policy, Guidelines for Administering the CJA and Related Statutes, Volume 7, Chap. 6., CJA Guideline, § 620.10.10(a)(appointment of counsel in capital cases) and Vol. 7A, Appx. 2A, page 27 and the WDNY Revised Plan for Furnishing Representation pursuant to the Criminal Justice Act 18 U.S.C. § 3006A ("hereafter "WDNY CJA Plan")[5].

Consistent with those rights, at the arraignments on January 10, 2024, this Court inquired as whether the government could confirm that it would not engage in an effort to pursue the death penalty in this case. The government did not rule out that possibility. That refusal necessitated the immediate appointment of Learned Counsel and capital resources to the defendants.

---

[5] The WDNY CJA Plan addresses the "Appointment of Counsel and Case Management in CJA Capital Cases." *See* WDNY CJA Plan at 23. In includes matters "in which the death penalty *may be* or is being sought by the prosecution" WDNY CJA plan, XV(B) (emphasis added). It also directs that the appointment "must" occur "*at the earliest possible opportunity*." Id. at XV(B)(3)(emphasis added).)

Even though the government did not rule out a death-penalty prosecution, it argued that the defendants would not be entitled to learned counsel or other capital resources because the indictment is not currently charged in a manner which would permit special findings for imposition of the death penalty.

The Court provided the parties with an opportunity to file written submissions regarding whether the defendants are entitled to learned counsel at this juncture despite the Government's position the current indictment has not been charged in a manner which would allow for the imposition of death.

Counsel for Gerace filed a submission for that purpose.[6] The submission addressed three points supporting the immediate appointment of learned counsel: (1) Count Two and Count Three are capital crimes within the commonly understood definition and the DOJ's own Justice Manual; (2) even if the defendants had not already been charged with capital crimes, this District has a history of appointing learned counsel and capital resources in circumstances based on allegations demonstrating a mere potential for a capital prosecution; and (3) information provided by the Federal Death Penalty Resource Counsel Project demonstrated there is an abundance of authority from other districts,

---

[6] In the government's reconsideration motion, it states that "Importantly, defendant Gerace's motion for assignment of second counsel was not predicated upon the complexity of the case, but rather entirely upon the premise that this could be a death eligible case. The words 'mega case' or 'complex case' are absent from Gerace's motion for learned (second) counsel." [355] at 3. That is true, but the briefing was specifically submitted to resolve the dispute regarding whether defendants were entitled to learned counsel regardless of whether the indictment currently charges special findings. There was no reason to be addressing the complexity of the case in the context of that issue.

throughout the county, demonstrating the need for appointment of learned counsel even prior to the charging of a capital offense. [42].

The government was provided an opportunity to respond, and it persisted in the argument that defendants should not be afforded the appointment of learned counsel. [50].

The parties next appeared on January 31, 2024. At that time, the question regarding whether the defendants are entitled to learned counsel based on the charges present in this indictment was resolved. The Court determined appointment of learned counsel was appropriate. *See generally*, [66]. The government turned to arguments of financial eligibility, arguing that Mr. Gerace and Mr. Ermin should not receive learned counsel, because the Court had not reviewed their financial status. The Court indicated that "with respect to those two defendants, who are also already qualified for appointment of counsel, Mr. Hinkle and Mr. Gogolack, they are going to get learned counsel" and it would await financial determination for Mr. Gerace and Mr. Ermin. [66] at 32.

Both Mr. Gerace and Mr. Ermin were subsequently found financially eligible for appointment of counsel, but before that determination was made, the government filed Notice that it would not seek the death penalty on February 23, 2024. [75]. Based on the mistaken belief that the determination not to seek the death penalty would not be subject

to further review, the defendants informally withdrew the requests for appointment of learned counsel.[7]

## C.  Requests for Second Counsel

Once the Court determined Mr. Gerace was financially eligible, it appointed Mr. Foti for continuity of representation.

At a status conference on March 8, 2024, Mr. Foti clearly made the request for a second attorney to be appointed. [355] at 36-37. Mr. Foti noted that the request was complicated by the fact that the government had moved to disqualify Mr. Gerace's other attorney, Eric Soehnlein, in case no. 19-cr-227.

The Court did not rule on the request for second CJA counsel to be appointed. The Court indicated that it was not going to decide that issue at that time: "I'm not granting that today nor am I denying. I'm just not deciding it." [355] at 37.[8]

Since that time, this case has been categorically identified as a mega case by the Circuit and the District. Multiple case budgets have been approved based on the case's

---

[7] The government argued in its reconsideration motion that the notice rendered the request moot. [355] at 3. The February 5th DOJ memorandum establishes that a request for learned counsel may be appropriate in any case where capital punishment may be charged even if a no seek letter has been provided, because the DOJ currently takes the position that those decisions are subject to reconsideration.

[8] Despite the fact that the Court was abundantly clear that it was not "deciding any of that today" ([355] at 38), the government's motion for reconsideration falsely claims the court denied this request. *See e.g.* [355] at 3 ("[t]he Court denied the request to appoint second counsel at that time"); *see also* [355] at 12, n 15. That was <u>clearly</u> not the case. [355] at 37-38.

status as a mega case. Moreover, the specific complexity of the case has been highlighted, repeatedly, by the government, demonstrating the need for second counsel.

Moreover, it is not just the defense that has suggested additional counsel should be appointed in this case. The government previously advocated for the disqualification of one of Mr. Gerace's attorneys in case no. 19-cr-227. During the course of that litigation, the government proposed: "[t]o offset Mr. Soehnlein's disqualification, the government respectfully requests the Court assign additional *attorneys* now, as the Court deems appropriate, to assist Mr. Foti in the defense of Gerace in Case Nos. 19-CR-227, 23-CR-37, and 23-CR-99." Case no. 19-cr-227, [919] at 14, n 8.

## D.  Complexity of this Case

The government repeatedly noted in the motion for reconsideration that the defense has had seven months to review discovery. However, at a status conference on February 23, 2024, over six months had passed since Mr. Gogolack was originally charged, and the government had already been collecting evidence for nearly seven months. Yet, it had provided no discovery to Mr. Gerace or Mr. Ermin post-indictment.

When this Court proposed a generous 60-day deadline, the government asked for 90 days, arguing that "this case involves a significant amount of discoverable material. It's a significant undertaking. *There's an agent from the FBI who has been essentially exclusively assigned to that task, but the resources that that requires are significant*. And so as opposed to setting a shorter deadline and rushing things for lack of a better word, I'd ask

that we set 90 days and allow a thorough review and production of discovery." [124] at

6-7 (emphasis added).

The defense indicated that it had no way of knowing what the volume of discovery

was, so it could not really argue in opposition to the lengthy timeframe requested by the

government, but Mr. Foti noted that the amount of time the government was asking for

demonstrated an enormously voluminous and complex case:

> One, I've had a number of mega cases where discovery could
> be produced in 30 to 60 days. So if it's going to take 90 here,
> that should indicate to the Court the volume of discovery and
> the complexity of discovery is so significant that it should
> weigh in on other considerations the Court currently has in
> regard to the appointment of counsel.

> [124] at 8.

Ultimately, this Court agreed to grant the extensive 90-day deadline, but it

specifically indicated that to the extent possible, the discovery should "be produced

sooner than that date" and it should be produced "[o]n a rolling basis so that people can

hit the ground running in terms of what they think they need to do." [124] at 12.

The government did not provide discovery on a rolling basis and would later

argue that it was unable to do so because of the volume and complexity of the discovery.[9]

---

[9] It was not until May 20, 2024, that the government advised defense counsel for the first time that it would need a hard drive containing space for up to 3 terabytes of data from each of the defendants in order to provide discovery. The government indicated the copying of discovery "upload may take 2-3 days to complete."

As this Court knows, the defense moved for sanctions because the government violated this Court's Order. [131, 132, 135, 137, 140]. In the government's response, it advised this Court that "The discovery project in this case was *extremely* large." [142] at 2.

In addition to the comments referenced above regarding an FBI agent exclusively tasked with organizing the discovery, the government acknowledged that the production of discovery involved multiple FBI agents, multiple HSI agents, and US Attorney's Office personnel. *Id*. Yet, the government was unable to start producing discovery until May 20, 2024, at the earliest, 136 days after the second superseding indictment was filed.

In addition to the volume of discovery, the government did not shy away from acknowledging the complexities of the case at that time:

> As set forth above, the *discovery in this case encompassed six different federal cases that were later subsumed by or incorporated into the instant indictment*. The volume of the discovery production is consistent with the seriousness of the case and the fact that *over twenty-five federal search and seizure warrants have been authorized and executed during the course of this case*.
>
> The materials seized pursuant to various authorizes searches ranged from physical items seized during premises searches (including firearms, weapons, drugs, ledgers, court filings, and lists), information and data from the Google cloud, and data from various electronic devices. The discovery includes extensive video footage from DVRs (including video of Crystal Quinn in Wellsville, New York days before her death), videotaped interviews of several defendants, and *virtually every other type of evidence available in a criminal prosecution* (such as autopsy reports, chemical testing reports, etc.).

[142] at 5 (emphasis added).

This excerpt does not even fully encapsulate the complexities of this case. The overt acts in this case include allegations pertaining to actions by defense attorneys on another case involving Mr. Gerace, case no. 19-cr-227, including some allegations that are demonstratively false and others that may require attorneys involved in the defense and prosecution of that case to be witnesses in this one.[10]

This case includes elements of organized crime, including specific allegations related to the Outlaws Motorcycle Club (OMC) and Rare Breeds Motorcycle Club (RBMC), which the government has referred to and relied upon at almost every juncture of this case, thus far, and the government will certainly attempt to advance those allegations further at trial.

The government motion to reconsider claims that "this case is no more factually or legally complicated than other cases…" ([355] at 15-16), but this position is inconstant with everything that has been previously detailed about the allegations and discovery in this case thus far.

---

[10] At a prior appearance on July 22, 2024, AUSA Tripi advised the Court that case "stands apart from all of the cases that I've had" and the government argues the events of that case "ended with the death of a witness," referring to the events addressed in this indictment. [169] at 12-14.

E.   The February 5, 2025, DOJ Memorandum Directing Review of Decision Not to Seek the Death Penalty

On February 5, 2025, the Attorney General (AG) issued a memorandum to all DOJ employees implementing Executive Order 14164 entitled "Restoring the Death Penalty and Protecting Public Safety." The memorandum directs that all prior no-seek decisions are to be reevaluated by the AG's Capital Review Committee, which will make a fresh determination concerning whether to pursue capital prosecution, including a determination of whether additional, not-currently-charged capital offenses should be added.  This review is to be completed within 4 months, or in other words, by June 5, 2025.  Based on this memorandum and Executive Order, the defense again requested that learned counsel be appointed for those defendants with capital-eligible charges.

At a conference held on February 10, 2025, the government had a full opportunity to argue against learned counsel being assigned. The Court indicated it was considering appointing learned counsel based on the DOJ memorandum [355] at 48.

The government represented it would press for more information from the DOJ about its position specifically with regard to this case.  The Court consented to the government's request for a short adjournment and held off appointing learned counsel to see if the government could get clarification by March 5, 2025, the next scheduled court date.

The government acknowledged that "Now, certainly, if the Court wants, it can— it always has the right to assign two attorneys and that—that would be up to you" ([355]

14

at 53), but then the government essentially opined that it did not believe the Court should do so. *Id*. at 53-54.

For the reasons previously addressed during the early litigation of this case, referred to above, the appointment of learned counsel is appropriate and necessary if there is the possibility that death penalty may be sought, and the DOJ's Memorandum promising to "restore" the death penalty specifically directs that the decision not to seek the death penalty in this case will be subject to review.

Thus, the appointment of learned counsel is appropriate, but in the interim, the Court has appropriately appointed second counsel to Mr. Gerace and Mr. Ermin based on the size and complexity of the case, mirroring the previous decision to allow Mr. Hinkle to continue representation by two attorneys.

This decision to provide Mr. Gerace and Mr. Ermin second counsel in furtherance of ensuring them an adequate defense is now the subject of the government's most recent reconsideration motion.

### III.    APPLICABLE LAW

The government's motion for reconsideration assumes that the government has standing to weigh in on appointment of counsel, argues the Court erred in its decision to appoint second counsel, and pursues reconsideration as a mechanism to seek removal of appointed counsel. Legal considerations regarding these issues are addressed below.

## A.  <u>Government Lack of Standing</u>

When an application is made for co-counsel or associate counsel, the request is made pursuant to 18 U.S.C. § 3006A(e).[11]

The CJA Guidelines make clear that the government has no role in the determination of defense funding under the Criminal Justice Act and this Court's discretion regarding who does, or does not, represent any defendant in any case.  *See* 18 U.S.C. § 3006A(e)(1); *see also* Guide to Judiciary Policy, Vol. 7, Part A ("CJA Guidelines"), § 310.30(a).

18 U.S.C. § 3006A(e)(1) provides, in relevant part:

> Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an *ex parte* application. Upon finding, after appropriate inquiry in an *ex parte* proceeding, that the services are necessary and that the person is financially unable to obtain them, the court … shall authorize counsel to obtain the services.

Similarly, Section 310.30(a) of the CJA Guidelines further provides:

> Ex parte applications for services other than counsel under 18 U.S.C. § 3006A(e) must be heard in camera and must not be revealed without the consent of the defendant.  The application must be placed under seal until the final disposition of the case in the trial court, subject to further order of the court….

---

[11] Defendant Joseph Bongiovanni, for example, was appointed two attorneys in this district, and a third attorney was subsequently appointed as associate counsel upon application to the District Court. Case. No 19-cr-227.

An application for the appointment of additional counsel, as opposed to primary or first counsel, is considered an "other service[] necessary to adequate representation," CJA Guidelines § 310.10.10, and the application is made under 18 U.S.C. § 3006A(e), *see* CJA Guidelines § 310.30 (Ex Parte Applications).

Although the government plays a role in identifying potential conflicts at the beginning of criminal proceedings, it is not afforded standing to weigh in on who will be appointed in any other respect, and it is not provided standing to weigh in on subsequent requests and determinations regarding defense resources.

## B.  The Court's Discretion

The government cited *United States v. Douglas*, 525 F.3d 225 (2d Cir. 2008) for the position that "where the death penalty will not be sought, a defendant's statutory right to have second court-appointed learned counsel is extinguished." [355] at 12.

Setting aside that the decision not to seek the death penalty in this case is now under review, it true that if the possibility of the death penalty is eliminated, a defendant is no longer statutorily entitled to learned counsel pursuant to 18 U.S.C. § 3005. However, it is well settled that this Court has broad discretion to appoint co-counsel pursuant to 18 U.S.C. § 3006A, where warranted.  Indeed, this Court has the complete discretion under 18 U.S.C. § 3006(e)(1) and/or the guidelines promulgated by the Judicial Conference to take measures to ensure that an indigent defendant has the resources to present an adequate defense, which includes the appointment of additional counsel when needed.

For example, in *Douglas*, the leading case cited by the government, the Second Circuit explained:

> Finally, we emphasize that the question on this appeal is whether the district court erred in requiring Douglas to proceed with only one government-funded attorney once it became clear that he would not be subject to the death penalty. Our conclusion that § 3005 does not entitle a defendant to a second attorney under these circumstances would not preclude a district court, in its discretion, from maintaining the dual appointment in a future case out of a "concern for fairness at the trial of a criminal offense," *United States v. Durant*, 545 F.2d 823, 827 (2d Cir. 1976). "[N]o right ranks higher than the right of the accused to a fair trial." *United States v. King*, 140 F.3d 76, 81 (2d Cir. 1998) (internal quotation marks omitted).
>
> *Douglas*, 525 F.3d at 238.

Although the government has attempted to weigh in on the appointment of second counsel in this case, the Circuit went further in *Douglas* to point out that "Deciding when, if ever, the retention of both counsel is necessary in the interest of justice after the government has announced it will not seek the death penalty is an exercise best left to the broad discretion of the district court." *Id*.

Other Circuits have made similar determinations. For example:

> In [*United States v.*] *Dufur*, [648 F.2d 512 (9th Cir. 1980)], this court held that 18 U.S.C. § 3005, which gave persons indicted for capital crimes a right to two attorneys, was eliminated along with the elimination of the death penalty. Dufur did not say that the court could not, in its discretion, appoint more than one attorney. Such a decision, therefore, is left to the sound discretion of the district court, taking into consideration the circumstances of each case. We decline to

> reconsider the reasoning of *Dufur* … and reaffirm the holding
> in that case.

*United States v. Steel*, 759 F.2d 706, 710 (9th Cir. 1985)

So long as the circumstances of the case warrant the appointment of additional counsel, it does not appear that any Circuit has restricted the District Court's ability to exercise its discretion to appoint additional counsel in a case where the death penalty was not being sought.

The Fourth Circuit has provided for an even more protective view of the defendant's right to counsel having long-held that whenever a defendant is charged with a capital-eligible crime, that in addition to § 3006A, defendant "is entitled, under § 3005, to representation by two attorneys regardless of whether a capital sentence is actually sought." *United States v. Shepperson*, 739 F.3d 176, 178 (4th Cir. 2014), *citing, United States v. Boone*, 245 F.3d 352 (4th Cir. 2001).

## C.  Motions for Reconsideration

Motions for reconsideration are generally permitted in criminal cases. Courts will commonly apply the civil standard of review in determining whether there is a sufficient basis for the motion. While motions for reconsideration are within the discretion of the court, they must also be weighed alongside the law of the case doctrine.

There is no statutory authority for a party to make a motion for reconsideration in a criminal case. However, the Supreme Court has "recognized the appropriateness of

petitions for rehearing by the United States in criminal cases" *United States v. Healy*, 376 U.S. 75, 78 (1964); *see also United States v. Dieter*, 429 U.S. 6 (1976)

Although, "some motions for reconsideration are so totally lacking in merit… there is no certain way of deciding in advance which motions for reconsideration have the requisite degree of merit, and which do not." *United States v. Ibarra*, 502 U.S. 1, 6–7 (1991).

Absent any "criminal procedure provision for a reconsideration motion, courts in this Circuit have applied the applicable civil standard to such motions in criminal cases." *United States v. Larson*, 07-CR-304S, 3 (W.D.N.Y. Nov. 23, 2013)

"[T]he standard for reconsideration is 'strict' and reconsideration '*will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters*, in other words, that might reasonably be expected to alter the conclusion reached by the court,'" *United States v. Briggs*, 10-CR-184S, 4 (W.D.N.Y. Nov. 7, 2012)(*quoting United States v. Amanuel*, No. 05-CR-6075, 2006 WL 266560, at *1 (W.D.N.Y. Jan. 31, 2006))(emphasis added).

There are three major grounds identified to justify a motion for reconsideration: "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atlantic Airways v. Nat. Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (*quoting* 18 C. Wright, A. Miller E. Cooper, Federal Practice Procedure § 4478 at 790).

"A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, *nor may [they] it be used as vehicle[s] for relitigating issues already decided by the Court*." *United States v. Smith*, 105 F. Supp. 3d 255, 258 (W.D.N.Y. 2015) (internal quotations and citations omitted) (emphasis added).

The "limitation on motions for reconsideration is to ensure finality and to 'prevent the practice of a losing party examining a decision and then plugging the gaps of the lost motion with additional matters.'" *Range Road Music, Inc. v. Music Sales Corp.*, 90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000) (*quoting Carolco Pictures, Inc. v. Siroto*, 700 F. Supp. 169, 170 (S.D.N.Y. 1988)).

It has been "recognize[d] 'that reconsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *In re Health Management Systems, Inc. Sec. Lit.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (*quoting Wendy's Int'l, Inc. v. Nu-Cape Construction, Inc.*, 169 F.R.D. 680, 685 (M.D.Fla. 1996)).

Thus, a motion for reconsideration "should be granted only in extraordinary circumstances." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (*citing Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 863 (1988)).

Furthermore, when a party brings a motion for reconsideration, it "must do so within the strictures of the law of the case doctrine." *Virgin Atlantic Airways v. Nat. Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).

D. <u>The Law of the Case Doctrine</u>

The law of the case doctrine indicates that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U. S. 605, 618 (1983).

A "clear conviction of error on a point of law that is certain to recur… will prevail over 'the law of the case' whereas 'mere doubt' will not." *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964).

"The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" *Johnson v. Holder*, 564 F. 3d 95, 99 (2d Cir. 2009) (*quoting United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir.2002))

Thus, as previously noted, "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked… a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader v. CSX Transportation, Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

"[T]he law of the case doctrine forecloses reconsideration of issues that were decided — or that could have been decided — during prior proceedings." *US v. Williams*,

475 F. 3d 468, 471 (2d Cir. 2007).[12]

# IV.    DISCUSSION

## A.  The Government Should Not be Permitted to Weigh in on Appointment of Counsel

Government prosecutors, whose functions include seeking convictions and who are under no duty or ABA Standard to investigate, develop and present a defense, are simply not competent to present a knowledgeable, unbiased, conflict-free view on what is necessary to investigate, develop and present an adequate defense for any defendant.

It is not surprising that counsel's request for additional resources sought pursuant to 18 USC § 3006A(e) may be requested in an *ex parte* application and resolved in *ex parte* proceedings. The government's objective to seek a conviction clearly divests them of input into discussion regarding the scope of resources that should be appropriately provided to a defendant to protect his constitutional guarantees to effective assistance of counsel.

The government should not be involved in determinations regarding defense resources, and it certainly should not be permitted to second-guess the Court's exercise of discretion in determining what resources to provide to a defendant, including the appointment of second counsel.

---

[12] The Second Circuit also defers to the Law of the Case Doctrine to foreclose reconsiderations of decisions it had previously decided. *See e.g. Vaughn v. Phoenix House New York Inc.*, 957 F.3d 141, 146-47 (2d Cir 2020); *see also Doe v. East Lyme Bd. of Educ.*, 962 F. 3d 649, 662-63 (2d Cir 2020)

Although, in a footnote, the government's motion quoted the provision of the WDNY CJA Plan that states the Court shall work "in cooperation with the Federal Public Defender and the United States Attorney … as will ensure timely appointment of counsel" and bolded "United States Attorney" in that quote ([355] at 9, n 11), the government omits that the duties of the US Attorney's Role are outlined earlier in the WDNY CJA Plan and are primarily limited to "supply[ing] the court a conflict list, identifying all attorneys who have a conflict with the defendant(s) and are therefore disqualified for assignment." WDNY CJA Plan at 7.

There is nothing with the WDNY CJA Plan that indicates the government should weigh in on who the Court appoints or what resources will be provided to the defendant, including determinations regarding whether to permit the appointment of two attorneys.

Other than reviewing appointments for known conflicts, the government should not be permitted to inject itself into determinations regarding appointment of counsel and the allocation of resources to defendants pursuant § 3006A.

B.  The Government's Motion Does Not Establish a Basis for Reconsideration

Motions for reconsideration are governed by Federal Rule of Civil Procedure 59(e) "which are meant to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Arthur Glick Truck Sales, Inc. v. Stuphen E. Corp.*, 965 F.Supp.2d 402, 404 (S.D.N.Y. 2013) (citation omitted), aff'd 577 F. App'x 11 (2nd Cir. 2014).

Although the government acknowledges the standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked, the government proceeds to argue against for reconsideration without establishing any of the three grounds that justify a motion for reconsideration.

There is no "intervening change of controlling law" regarding the appointment of counsel, and there is certainly no "new evidence" other than perhaps the government's general unsworn assertions that this case is not unusually complex, which stands in stark contrast to the government's prior comments and actions throughout the history of this case.

Although, the government never explicitly says so, it appears that its request for reconsideration is based on the position that this Court committed clear error or a manifest injustice. That is clearly not the case.

The government does not cite any appellate authority where it was determined that a District Court erred, let alone committed clear error, in the appointment of two attorneys to a defendant. As *Douglas* clearly states, even when a defendant is not statutorily entitled to learned counsel, the Court is not precluded "from maintaining the dual appointment... out of a 'concern for fairness at the trial of a criminal offense.'" *Douglas*, 525 F.3d at 238.

There is no feasible route for the government to argue that supplying a defendant with adequate resources, including second counsel, is clear error, especially in a case such as this, where the government has previously spoken to how challenging it was to compile the voluminous discovery and how diverse the types of evidence are. *See* [142] at 5, *supra* (this case includes "virtually every other type of evidence available in a criminal prosecution (such as autopsy reports, chemical testing reports, etc.)").

Nor can the government argue that there is a manifest injustice for a defendant to have two attorneys, particularly in a case where nine different government attorneys have entered appearances on the docket in a 13-month span, and at least four have actively made arguments in court at various times during that timeframe.

The government utterly fails to establish a basis to entertain a reconsideration motion, particularly as it pertains to an issue of appointment of counsel, which the government should not be permitted to weigh in on in the first instance.

C.   The Government's Reconsideration Motion Consumes Defense Resources and Risks Causing Additional Unnecessary Delay

While the government complains that it does not want to delay the motion schedule, even after it had a full opportunity to argue its position to this Court in opposition to second counsel being appointed, it filed its 32-page motion for reconsideration – 91 pages including exhibits – to which the defense must now respond (despite the 25-page limit for motions contained in local rule 12[c]).

The Court should see this tactic for what it is – the government opposes additional counsel not out of a concern for taxpayer expense, but to cement its advantage by inundating two small firm practitioners with discovery and motion practice. As judges in our district have often repeated, this should not be a game of "gotcha" especially when defendants, whether they are capital-eligible or not, face extremely serious consequences if convicted.

As discussed above, there is no legitimate basis for the government's motion. There is no intervening change in law or controlling decisions the Court overlooked. There is no data the Court failed to consider that would lead to a different result. Simply put, the defendant is entitled to learned counsel because of the potential for the death penalty to be sought, but even if that circumstance does not materialize, the Court had exercised appropriate discretion to appoint two lawyers on a mega-case. There was no requirement that the Court make any specific recitation on the record to comply with its duty to consider the factors that would justify its decision.

Despite this, the government moved for reconsideration, which continues the pattern of the government filing for "reconsideration" as a way to get a second bite of the apple (and a third when they object or appeal to the district court) (*see e.g.*, *United States v. Gerace*, case no. 19-cr-227; *United States v. Morgan*, case no. 18-cr-108; *United States v. Parks*, 19-cr-87). In this case alone, the government has filed three reconsideration motions in thirteen months [86, 191, 355].

This is a transparent strategy to pressure judges into ruling in the government's favor.  Already overburdened judges now hear the same issue multiple times and are faced with even more delays.

The instant motion fails to raise adequate grounds for reconsideration and violates the spirit of the rule, which is reserved for preventing manifest injustice when a court is unaware of controlling authority or new decisions are issued that could impact its analysis. That is clearly not the case here.

D.  <u>The Government Claims Concern for Taxpayer Expense Without Any Oversight or Limit on its Own Expenditure of Funds</u>

The government has had nine attorneys enter appearances on this case. At least six government attorneys have filed submissions in this case. At least three government lawyers are currently assigned and actively involved in this case. The government is utilizing paralegals and assigned federal case agents.

The defense has no say in the number of attorneys the United States Attorney assigns in cases prosecuted against our clients in this district despite the public costs of such staffing decisions. The defense does not get to argue that the Court should intervene based on concerns over taxpayer expense when the government spends funds on experts or provides financial consideration to prospective witnesses.

Nor does the defense have any say in whether the DOJ should review this case again for potential capital punishment, or in whether the government files "special

findings" in murder counts or whether these potentially capital cases are fast-tracked-or "no-tracked" at arraignment—to avoid the immense public costs these prosecutorial decisions extract on our community.

The government has not provided an accounting to the court, the public, or the defense as to the immense expenditures it has accumulated in its prosecution of these cases.

But, even if the government is taken at its word that it is concerned about the public cost of appointing two lawyers, such concern does not provide the basis for the government's ability to sculpt the dimensions of Mr. Gerace's and Mr. Ermin's representation to its liking. There are two other defense teams similarly situated to Mr. Gerace and Mr. Ermin, with two lawyers each. There is no reason for the government to specifically target Mr. Gerace and Mr. Ermin's representation, particularly when the government attorneys will still outnumber the number of attorneys on any of the defense teams.

The government is in no position to supersede the Court's judgment regarding whether funds should be expended to adequately finance a fair defense, particularly when the government is actively utilizing taxpayer funds to attempt to secure the convictions of Mr. Gerace and Mr. Ermin.

E.  <u>The Court Should Still Appoint Learned Counsel and Capital Resources</u>

The government's arguments about whether the Court should continue second counsel following the government's election not to pursue capital prosecution are all premature at this point.  Given the February 5, 2025, memorandum, there is no longer a final determination in this case the that government will not seek capital prosecution; the government's previous no-seek declaration is no longer binding.  Pending further DOJ review, the government is presently unable to unequivocally state that it will not seek capital prosecution.

As noted in the government's motion, at the previous court appearance, the Federal Public Defender correctly recited the standards for appointment of learned counsel under the relevant authorities. [355] at 8.

Likewise, in his motion for the appointment of learned counsel that preceded the government's prior no-seek determination, defendant Gerace correctly directed the Court to 18 U.S.C. § 3005, 18 U.S.C. § 3006A(e), the Judicial Conference Guide to Judicial Policy, Guidelines for Administering the CJA and Related Statutes, Volume 7, Chap. 6., CJA Guideline § 620.10.10(a) (appointment of counsel in capital cases) and Vol. 7A, Appx. 2A, page 27, Chap. 3, CJA Guideline § 310.10.10 as providing the authority and obligation for the appointment of learned counsel. [42].  The Court was not required to decide the learned counsel issue at that time because the government's initial no-seek declaration

was filed before argument of defendant's motion, rendering that motion moot. It no longer is.

Unless the government is willing at this point to unequivocally commit to not pursuing capital prosecution – which it cannot do, per the AG's memorandum – this is a case "in which the death penalty may be or is being sought by the prosecution" (WDNY CJA plan, as amended May, 2019, XV[B][1] [emphasis added]) and for which "[c]apital counsel must be appointed . . . at the earliest opportunity" (id. at XV[B][3]), i.e., pursuant to 18 U.S.C. § 3005, appointment of two counsel for each defendant, one being "learned in the law" in death penalty matters (see Guidelines for the Admin. Of the Criminal Justice Act, vol. VII § VII, § A ch. 6.02 B(2) [2008].

Therefore, pursuant to the above sections of the CJA plan and United States Code the Court should appoint learned counsel and issue an ex parte preliminary order allowing the defendant to obtain the services necessary for the investigation and representation in a potentially capital case. These steps would be both consistent with the directives of the WDNY CJA plan for representation in capital or potentially capital cases and with the history of the issuance of such orders in this district.

For example, in *United States v. Johnny Rounds*, 10-cr-00239-WMS-HBS, Mr. Rounds was initially charged together with his codefendants in an indictment charging a continuing criminal enterprise to possess and distribute narcotics and marijuana. However, based on the government's investigation and its refusal based on that

investigation to commit to not pursuing capital prosecution, capital counsel was appointed at arraignment on the first, non-capital indictment. It was not until two years later that a superceding indictment was returned which included special findings permitting the capital prosecution of Rounds. Thereafter, the government ultimately elected not to pursue capital prosecution and Mr. Rounds pleaded guilty to a reduced offense, but not before going through the full capital review process.

In *United States v. Rodshaun Black*, 12-cr-00083-WMS-HBS, Mr. Black was charged in an indictment charging kidnapping, robbery and murder in furtherance of a Hobbs Act conspiracy, but that did not include special findings. Based on the government's refusal to commit to not seek capital prosecution, capital counsel was assigned at arraignment and an order authorizing pre-capital services was issued by the magistrate judge. It was not until 2½ later that the government finally committed to not pursue capital punishment and the case proceeded to a non-capital jury trial. In the interim, the defendant was forced to prepare his mitigation and investigation as if the matter might ultimately involve capital prosecution.

Further, in *United States v. Jonathon Cruz-Carmona*, 18-cr-06094-FPG-MJP, Mr. Cruz-Carmona was charged by criminal complaint with participating together with the codefendants in a conspiracy to distribute narcotics. In that case, like this case, the government's investigation suggested that the defendant was involved in a murder in furtherance of a charged conspiracy. Although that incident was not referred to in the

criminal complaint or included in the original charges, the Magistrate Judge Feldman, sua sponte, appointed capital counsel and issued an order providing precapital resources at the criminal complaint stage, after being advised of these circumstances. The defendant was thereafter named in an indictment that did not include special findings and, before a superceding indictment was filed, the government affirmatively declined to pursue capital prosecution.

Here, capital prosecution is possible and has not been definitively disavowed by the government.  The authorities cited above therefore require the appointment of learned counsel and a preliminary order authorizing a capital budget.  The Court should issue an order granting the same immediately.

F.    This Case Supports the Determination that Two Attorneys Should be Retained
      Even if the Government Indicates That It Still Does Not Intend to Seek the Death
      Penalty

Although 18 U.S.C. § 3005 is silent as to whether a defendant has a right to continue with two counsel after the government has removed the death penalty as a potential sentence. (*see United States v. Douglas*, 525 F.3d 225 [2nd Cir. 2008]), as the government as acknowledged, the Court unquestionably has discretion to appoint or continue second counsel ensure the accused gets a fair trial.  This discretion has frequently been exercised in this District, in both originally capital and non-capital cases.  If or when the government unequivocally disavows the intention to pursue capital prosecution,

defendants contend that the Court should reject the government's attempt to remove second counsel and continue such counsel, for the reasons set forth below.

The Guidelines for the Administration of the Criminal Justice Act (CJA Guidelines) likewise provide that "extenuating circumstances" may warrant retaining dual counsel in non-capital cases which began as potentially capital prosecutions (see Guidelines for the Admin. of the Criminal Justice Act, vol. VII, § A, ch. 6.02.B(2) [2008]). This is the basis of the Court's authority to appoint second counsel in this case, as well as 18 U.S.C. § 3005; not, as the government argues, that the Court misconstrued the internal DOJ memorandum as creating some right to counsel.

To determine whether extenuating circumstances are present, the court should consider the following factors:

a) the need to avoid disruption of the proceedings;

b) whether the decision not to seek the death penalty occurred late in the litigation;

c) whether the case is unusually complex, and

d) any other factors that would interfere with the need to ensure effective representation of the defendant.

*Id*.  By the very terms of subparagraph "d", the list of factors is not exhaustive or exclusive.  The government cites the Court's alleged failure to find on the record that this is a mega case, however there is a requirement that the Court make such finding before appointing second counsel.  The term "mega case" pertains to CJA budgeting rules and the factors courts examine to determine if the complexity of a case is outside the heartland

of federal cases while not dispositive, is useful here.  Examination of those factors reveals that this case unquestionably meets the definition of mega case.

According to CJA Budget Counsel, non–capital "mega-cases" involve anticipated attorney hours exceeding 300 or the total cost is over $46,000.  Other signs of a mega case are:

1. Large discovery cases

2. Complex cases

3. Large multiple defendant cases

4. Large indictments with multiple counts

5. Organized crime cases

6. Drug trafficking/Drug kingpin cases

7. Gang cases

8. Any case which appears, from an early stage, destined for trial

Notably, Mr. Hinkle's case has already been accepted by the Circuit and the District Court for budgeting purposes as a mega case and mega case budget has been approved. Likewise, Mr. Ermin's case been accepted by the Circuit and the District Court for budgeting purposes as a mega case and a mega case budget has been approved.  So perhaps most significantly, the government's late-breaking protestations that this is not a mega case are now irrelevant and moot.

The term "complex," as it relates to a criminal case, is defined under § 230.23.40(b) of the Guidelines for Administering the Criminal Justice Act (CJA) and Related Statutes (which states when it is appropriate to waive case compensation maximums), as well as under the Speedy Trial Act. Under, § 230.23.40(b), a case is complex if the legal or factual issues in a case are unusual, thus requiring the expenditure of more time, skill, and effort by the lawyer than would normally be required in an average case. New York district courts, for instance, have identified factors that the court should consider in assessing the complexity of a case in the context of compensation maximums: unusual or difficult legal or factual issues, multi-count indictments, voluminous evidence, and other circumstances, such as numerous or complex defenses that require a greater than average amount of time or skill in preparing the defense (*see United States v. Ledbetter*, 107 F.Supp.3d 849 [S.D.Ohio 2015]).

The government primarily cites two cases in support of its argument: *United States v. Eldridge*, 09-cr-329, a case where second counsel was removed several months before trial; and *United States v. Pirk*, 15-cr-142, the Kingsmen motorcycle gang prosecution where although second counsel was permitted to remain, the government argues it was more complex than the instant case, thereby justifying the continued appointment of two counsel after the government declined to seek the death penalty.  Ms. Meyers Buth participated as cocounsel in both cases; a partner in Mr. Thompson's firm represented the

lead defendant in both cases.  Thus, new counsel are familiar with the facts and circumstances of those cases.

Chief Judge Wolford presided over *Pirk* and distinguished *Eldridge* in her decision to continue two counsel after the government notified the defense it would not seek the death penalty. She noted that continuation of two counsel is entirely within the Court's discretion: " '[N]o right ranks higher than the right of the accused to a fair trial' (internal cite omitted) [T]he Douglas court, 'emphasiz[ed]' that a district court, in its discretion, may continue the appointment of two counsel and [  ] did not intend its ruling to discourage courts from maintaining the dual appointment [of counsel] in a future case out of a 'concern for fairness at the trial of a criminal offense'" (id. at 238, quoting *United States v. Durant*, 545 F.2d 823, 827 [2nd Cir. 1976])." *United States v. Pirk*, 1:15-cr-00142-EAW-MJR Document 170 Filed 06/06/16, p. 6; *see also United States v. Boone*, 245 F.3d 352, 358 (4th Cir. 2001) (Other Circuit Court of Appeals leave the continuation of a second counsel to the discretion of the trial court, with the Fourth Circuit a notable exception; the Fourth Circuit continues an indicted capital defendant's right to two attorneys notwithstanding the government's subsequent decision not to seek the death penalty).

Judge Wolford specifically noted in Pirk that the government only told half the story when it relied on *United States v. Thamud Eldridge, et al* to support its effort to reduce Mr. Pirk's defense team (Gvt motion Docket Entry # 163 at 4).

"The government neglected to inform the Court that in *Eldridge*, the government's first two attempts to reduce defense team were denied. It was only after over four years of litigation, and after all pre-trial motions were decided, that the Court reduced the defense teams to a single attorney for the multi-defendant trial. The government also neglects to note that in *United States v. Johnny Rounds*, (10-CR-6096), decided after *Eldridge* the District Court (Judge Skretny) denied the government's attempt to reduce Rounds' team to one attorney. In fact, in *Rounds*, the District Court increased the defense team by adding an attorney. In contrast to these complexities, in *United States v. Douglas, supra*, the case the government relies on, the trial involved a two-count indictment involving the single murder of an ATM technician during a larceny attempt. . . So too, in *United States v. Michael Stevens* 93-714, Chief Judge Telesca continued dual representation in a non-capital package bombing trial and *United States v. David Cain, Jr.* 05-0360, Chief Judge Arcara appointed two lawyers in a non-capital (non-murder) RICO trial."

*Id*. at 10-11.

Here the government likewise failed to mention that Magistrate Judge Scott denied two prior motions in the *Eldridge* case to remove second counsel due to its complexity.

Aside from the complexity of the case, in *Pirk*, Judge Wolford noted the unique demands on counsel including defendant's detention at a jail a long distance from counsel's office.  Here, Mr. Gerace is housed at the Chautauqua County jail, 2½-3 hours from Mr. Foti's office and 1½ hours from Ms. Meyers Buth's office.  Mr. Ermin is housed

in the Livingston County jail, 1½ hours from Mr. Muscato's office and approximately ½ hour from Mr. Thompson's office.  Due to the government's insistence on a protective order, discovery cannot be mailed to the client and requires counsel to travel to the jail and review the voluminous discovery with the defendant in person.

As another example, with respect to Mr. Ermin, upon review of the indictment the government is signaling an intention to call an expert on motorcycle clubs, apparently to offer testimony that the Outlaw Motorcycle Club is a gang or a criminal enterprise.  The introduction of such expert would require a Daubert hearing of one or more days in length, the review of extensive background material to prepare, and the identification and preparation of a similar defense expert.

The volume of discovery required the defense to provide a 3 terabyte hard drive to the government on which to load the discovery. While government claims the discovery is "organized" and "searchable" [govt mot. p.24] there are numerous individual electronic folders for which no index was provided.

Aside from the voluminous discovery, the indictment makes reference to two other federal cases pending against Mr. Gerace, one of which was tried last year over a period of 8 weeks. The instant indictment itself makes reference to that related indictment and requires counsel in this case to review evidence in that related case (19-cr-227, 23-cr-37: charged inter alia three counts of witness tampering and distribution of cocaine).

Such demands add to the challenge and time commitment required of the lawyers who work in small law firms of 1 or 2 lawyers for whom these may be oppressive burdens. The United States Attorney's Office has at least three lawyers for what it now claims is a "routine," non-complex case. Mr. Gerace and Mr. Ermin had only one attorney appearing for them; both of whom work in small firms of 1 or 2 lawyers and for whom this case presents a significant challenge in terms of the dedication of resources.

In addition to conducting legal and factual research into the validity of this indictment itself, the government's litigation strategy has meant the defense has been forced to respond to three motions to reconsider rulings by the Magistrate Judge already. While substantive defense motions have not yet been filed, there has been extensive litigation over detention, objections to the terms of the protective order, sanctions imposed on the government based on its failure to timely provide discovery, and now re-visiting the government's decision not to seek the death penalty. It has not indicated that it would seek an expedited review; nor has it indicated a willingness to sever the non-capital eligible defendants to move forward with their trials.

While the government argues that publicity in a high-profile case like this one does not necessarily mean it is "complex," in Pirk, Judge Wolford considered the need to investigate and respond to the extensive publicity generated by the case. Here, that may also include the defendants moving for a change of vicinage which requires gathering and reviewing all relevant media articles or broadcasts which are voluminous and which

suggest the possible prejudice attendant to trying this case in the district and the court where Mr. Gerace has already been convicted.

Notably, among the other factors Judge Wolford considered in *Pirk*, she found that the cost of appointing second counsel would be de minimis, given that two lawyers could divide responsibilities: "The additional costs in this case are insubstantial, especially when compared to the substantial prejudice the reduction of lawyers will cause to Mr. Pirk".

While the *Pirk* indictment contained 46 counts (72 pages) and the indictment in this case is 28 counts (58 pages), both are complex (the *Eldridge* case involved four defendants named in a 17-count indictment). While not specifically charged, the government has alleged that Mr. Gerace is the head of Italian Organized Crime. Numerous witnesses were called at his related trial for sex trafficking and drug dealing at Pharaoh's Gentlemen's Club where the victim of the alleged homicide in this case worked. The geographic scope of the charges extends from Erie County to Allegany County.

Thus, if or when the government unequivocally disavows the intention to pursue capital prosecution, the Court should continue second counsel. In addition to the above-cited cases, the exercise of judicial discretion to appoint second counsel on both capitally eligible and never-capital cases in this District is not novel or unique. Examples abound.

For one, in *United States v. Hay*, 19-cr-170-RJA, the two capital-eligible defendants were arrested in July and August 2019.  Thereafter, they were indicted for the murder of an ATF informant. In addition to gun and drug charges, the defendants faced other charges including offenses relating to retaliating against a witness and obstruction of justice; the very same statutory violations charged here. In Hay, two lawyers were assigned, including Ms. Meyers Buth. After presentation to the Capital Review Committee, capital prosecution was not authorized, however the government never moved to have the court relieve second counsel. Pretrial discovery and evidentiary hearings were then conducted. Mr. Hay pled guilty just before trial and continues to be represented by two counsel pending sentencing.

The Court has discretion regarding whether to continue with two attorneys after the DOJ decides not to seek death in a given case, such as occurred here (*see United States v. Douglas*, 525 F.3d 225, 238 [2nd Cir. 2008]; *see also United States v. Eagan*, 2011 U.S. Dist. Lexis 37724 [W.D.N.Y. 2011] [relying on *Douglas* to continue second counsel for one defendant]; *United States v. Wilson*, 19-cr-155 [W.D.N.Y. 2023]).

In United States v. Wilson, et al., Chief Judge Wolford permitted two lawyers to continue to represent the two lead defendants; no objection or motion to remove second counsel following the "no seek" determination in that case.  This case is no less complex than United States v. Wilson.

Here, in Mr. Hinkle's case, the initial "no seek" was February 23, 2024. This court, on June 11, 2024, ordered Mr. Henry to continue and remain as second counsel with Mr. Bogulski. Between those two dates, the government never sought, via motion or any other avenue, to have Mr. Henry removed from the case. Now, the government, for a continuous twelve-month period, has never sought to have Mr. Henry removed from the case as second counsel.

In *United States v. Raul Ledesma Abarca*, 17-cr-095, where the indictment charged only possession and conspiracy to possess with intent to distribute narcotics, Judge Wolford appointed second counsel for the trial of the case [102, 107], on the application of single defense counsel [98] and over the government's objection [100].

In *United States v. Wayne McDaniels*, case no. 23-cr-6054, the indictment charges conspiracy to possess and possession with intent to distribute narcotics as well as weapons charges, Magistrate Judge Payson appointed two counsel at the request of conflict counsel once the Federal Public Defender's Office was relieved based on a conflict of interest [168].

In *United States v. David Burgin*, case no. 20-cr-29, where the indictment charges possession and conspiracy to possess with intent to distribute narcotics and weapons possession counts, Magistrate Judge Schroeder appointed second counsel at the request of a single counsel to assist in the preparation of discovery and proof beginning with pretrial suppression hearings.

While the government repeatedly complains of the Federal Defender's involvement in the composition of the defense teams, the government's advocacy regarding the composition of Mr. Gerace's defense team raises troubling issues.

At least on its face, this appears to be an attempt to gain a tactical advantage in the case by limiting the resources of certain defendants. This Court can exercise its discretion in this delicate and important task pursuant to its authority under the CJA plan without any input from the government. In fact, that is how the appointment process of defense counsel generally works–outside of the influence of the federal prosecutor. There is no issue involving a conflict of interest, and the government's advocacy on this issue–which at root involves the composition of the government's courtroom adversary–is unnecessary and intrusive. The defense does not have any voice in the composition of the prosecution team, nor the number of prosecutors that the United States Attorney's Office elects to devote to this case.

The government complains that second counsel in this case was assigned "on the ordinary rotational basis" ([355] at 25), but it could not know that. The government does not have access to the "wheel" for assignments and it very well could have been so assigned. By way of example, in *United States v. Brian Rosenthal*, 23-cr-102, Mr. Thompson was appointed by Magistrate Judge Schroeder after prior counsel was relieved based on the government's motion raising a conflict of interest and other defense counsel

practicing in the District were precluded from accepting the case based on conflicts of interest (text order, 02/09/2024).

The government's position in this case stands in marked contrast to the prosecutors in other jurisdictions. For example, in *United States v. Tillman* (756 F.3d 1144 [9th Cir. 2014]) the Court addressed a writ of mandamus of the second capital counsel who had been removed (and replaced) in a formerly capital case.  In its brief, the government recognized "the importance that appointed defense attorneys operate independently of the prosecution," and that "federal law and administrative policy has long precluded participation by the U.S. Attorney's Offices in CJA-related matters." It took the same position with respect to the court's supervisory authority over the matter of [the attorney's] discipline (*Tillman* at 1157, n 1 [emphasis added]).

Likewise, in state-level prosecutions, the Monroe County Assigned Counsel Plan provides for the appointment of two counsel in any case involving a death or where a sentence of life imprisonment could be imposed following conviction.  No motion is necessary, no objection is made, or would be entertained, by the prosecution; such assignments are standard operating procedure, made as a matter of course.

Despite the government's objections, in this case, the appointment of second counsel who happen to be "learned counsel" ensures that if the government's prior decision not to seek capital prosecution is reversed, there will be no interruption in the defendants' representation. More to the point, the government's objections on behalf of

the public purse ring hollow, given the government's unbridled expenditure of resources; it appears that the objection is not so much the resources being expended, but rather, to who is expending them.

## V.     CONCLUSION

For all of the reasons set forth above, Mr. Gerace and Mr. Ermin respectfully request that the government's Motion for Reconsideration be denied and appointed counsel be permitted to continue.

DATED:     Orchard Park, New York
           February 27, 2025

                                        /s/ Cheryl Meyers Buth
                                        Cheryl Meyers Buth, Esq.
                                        MEYERS BUTH LAW GROUP, PLLC
                                        *Attorneys for Defendant Peter Gerace, Jr.*
                                        21 Princeton Place, Suite 105
                                        Orchard Park, New York 14127
                                        (716) 508-8598
                                        cmbuth@mblg.us

DATED:     Rochester, New York
           February 27, 2025

                                        /s/ Mark A. Foti
                                        Mark A. Foti, Esq.
                                        THE FOTI LAW FIRM, P.C.
                                        *Attorneys for Defendant Peter Gerace, Jr.*
                                        16 W. Main Street – Suite 100
                                        Rochester, New York 14614
                                        (585) 461-1999
                                        mark@fotilaw.com

DATED:      Rochester, New York
                February 27, 2025

/s/ Donald M. Thompson
Donald M. Thompson, Esq.
EASTON THOMPSON KASPEREK
SHIFFRIN LLP
*Attorneys for Defendant John Ermin*
16 W. Main Street – Suite 243
Rochester, New York 14614
(585) 423-8290
dmthompson@etksdefense.com

DATED:      Lockport, New York
                February 27, 2025

/s/ George V. C. Muscato
George V. C. Muscato, Esq.
MUSCATO, DIMILLO & VONA, LLP
*Attorneys for Defendant John Ermin*
107 East Avenue
Lockport, New York 14094
(716) 434-9177
georgemuscato@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                          23-CR-99-LJV

SIMON GOGOLACK, et al,

                    Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2025, I electronically filed the foregoing Response to Government's Motion for Reconsideration with the Clerk of the District Court using the CM/ECF system and electronically served all parties, including the following:

Caitlin M. Higgins, Esq.
U.S. Attorney's Office – WDNY
138 Delaware Avenue
Buffalo, NY 14202
Caitlin.higgins@usdoj.gov

Joseph M. Tripi, Esq.
U.S. Attorney's Office – WDNY
138 Delaware Avenue
Buffalo, NY 14202
Joseph.tripi@usdoj.gov

Nicholas Cooper, Esq.
U.S. Attorney's Office – WDNY
138 Delaware Avenue
Buffalo, NY 14202
Nicholas.cooper@usdoj.gov

Pierre R. Antoine, Esq.
U.S. Attorney's Office – WDNY

138 Delaware Avenue
Buffalo, NY 14202
Richard.antoine@usdoj.gov

Stacey N. Jacovetti, Esq.
U.S. Attorney's Office – WDNY
138 Delaware Avenue
Buffalo, NY 14202
Stacey.jacovetti@usdoj.gov

Tiffany H. Lee, Esq.
U.S. Attorney's Office – WDNY
138 Delaware Avenue
Buffalo, NY 14202
Tiffany.lee@usdoj.gov

Paul G. Dell, Esq.
70 Niagara Street
Buffalo, NY 14202
pgdell@aol.com

Clair A. Montroy, III, Esq.
97 Lake Street
Hamburg, NY 14075
Montroylaw@verizon.net

Brian J. Hutchison, Esq.
14 W. Main Street
Lockport, NY 14094
bjhesq@gmail.com

David B. Cotter, Esq.
380 Cleveland Drive
Buffalo, NY 14215
dbacotter@aol.com

/s/ Mark A Foti
Mark A. Foti, Esq.
